UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CASE NO. 4:06-CV-23-R

MILES FARM SUPPLY, LLC                                              PLAINTIFF

v.

HELENA CHEMICAL COMPANY                                          DEFENDANT

## MEMORANDUM OPINION

This matter is before the Court upon the Plaintiff's Motion for Partial Summary Judgment (Docket #43) and the Defendant's Motion for Summary Judgment (Docket #52). The Defendant's Motion also serves as its response to the Plaintiff's Motion. The Plaintiff filed a combined response and reply (Docket #59) and the Defendant filed a reply (Docket #62).

The Plaintiff's Complaint alleges six claims against the Defendant: (1) conversion, (2) aiding and abetting breach of fiduciary duty; (3) interference with contractual and business relationships; (4) misappropriation of trade secrets and confidential information; (5) unfair competition, and (6) punitive damages. The Plaintiff has moved for summary judgment only as to (2), aiding and abetting breach of fiduciary duty, while the Defendant has moved for summary judgment as to all six counts. For the sake of clarity and convenience, this Opinion resolves both motions.

For the following reasons, the Plaintiff's Motion for Partial Summary Judgment is **DENIED**, and the Defendant's Motion for Summary Judgment is **GRANTED**.

## BACKGROUND

The Plaintiff, Miles Farm Supply, LCC ("Miles"), is a company headquartered in Owensboro, Kentucky, and owned by Mr. and Mrs. William S. Miles and their son, Billy Joe Miles. Billy Joe Miles' daughter, Debra Miles Seymour, is the current President of the

company.  Miles operates a number of retail stores under the name Miles Farm Stores in Kentucky, southern Indiana, and southern Illinois.  Miles is also engaged in the wholesale distribution of agricultural chemical products in the same geographic area, operating under the name Big Rivers Agri-Supply ("Big Rivers").  The Big Rivers division of Miles is involved in this action.  In this action, the terms "Miles" and "Big Rivers" are used somewhat interchangeably.  While the majority of the employees involved in this action were employed by the wholesale Big Rivers division, they have generally been referred to as "Miles employees."

In January of 2005, a number of Miles employees resigned their employment and accepted positions with Helena Chemical Company, headquartered in Collierville, Tennessee, a direct competitor of Big Rivers in the wholesale distribution of agricultural chemical products to dealers in Kentucky, Southern Indiana, and Southern Illinois.  All of the employees were employed at-will by Miles.  In January of 2006, Miles filed this action against Helena, alleging that Helena is liable for lost sales and business disruption as a result of the resignations.

Ten of those employees, Benny Tincher, Brian Mattingly, Jerry Mattingly, Abe White, Matthew Hayden, Tommy Dublin, Jr., Jack Hamilton, Richard Peveler, Anita Fuqua, and Gregory Clifton, are named in the Complaint and will be hereinafter referred to as the "former Employees."  These ten former Employees are the plaintiffs in a separate state action filed against Miles, the subject of which is unpaid annual incentives for 2004.  The former Employees most central to this action are Benny Tincher ("Tincher"), Brian Mattingly ("B. Mattingly"), and Jerry Mattingly ("J. Mattingly").  Just prior to October 2004, Tincher was Miles' General Manager, B. Mattingly was Miles' Sales and Marketing Manager, and J. Mattingly was the Chemical Operations Manager.  Abe White, Matthew Hayden, Tommy Dublin, Jr., and Jack

2

Hamilton were sales representatives.  Richard Peveler, Anita Fuqua, and Gregory Clifton held various positions within Miles' office.

In 2003, Debra Miles Seymour ("Seymour") became president of the company, assuming the position her father had held.  In 2004, Seymour began moving Miles from a general manager structure to a leadership council structure, based on  the book <u>Good to Great: Why Some Companies Make the Leap...and Others Don't</u> by Jim Collins.  In January 2004, Miles held a meeting of its management at the Field House, a corporate retreat facility in Owensboro, to discuss structural changes to the company.  Those in attendance, including Tincher and B. Mattingly, discussed what the new structure of the company would look like and how it would function.  After the meeting, those in attendance were asked to generate PRDs, or job descriptions, for positions within the new structure.  The development of the PRDs was an ongoing process.

Ultimately, on October 1, 2004, Seymour sent a memorandum to all Miles employees announcing that the company would be transitioning to management by a Leadership Council, comprised of a President and Directors of Sales and Marketing, Logistics/Operations, Finance, People, and ITA (Innovation, Technology and Alliances).  The memorandum announced that Seymour would remain as President and Ray Purk ("Purk"), Miles' recently hired CFO, would fill the Finance position.  All other employees were invited to submit resumes in order to be considered for a Council position.  In October, Miles hired Greg Head ("Head"), and he was appointed to the Leadership Council as the Director of People.  Seymour, Purk, and Head served on the committee that selected the remaining members of the Council.

The move to the Leadership Council eliminated Tincher's General Manager position, a

position he had held since 1997.  On November 8, 2004, he interviewed for a place on the

Council.  Seymour, Purk, and Head discussed Tincher after his interview and mutually agreed

that he should not be placed on the Council.  On November 22, 2004, Seymour informed Tincher

that he would not be offered a position on the Council.  On November 30, 2004, Tincher met

with Seymour and Billy Joe Miles to discuss his future with the company.  That day, he accepted

the position of Business Development Leader.

   B. Mattingly's position was not eliminated by the Leadership Council structure, but he

chose to submit a resume for one of the open Council positions.  However, he withdrew his

application because he disagreed with the appointments of Purk and Head to the Council and did

not agree with the manner in which the Council was developing.  In addition, after his interview,

Seymour announced that the period for submitting Council applications would be reopened and

extended, a decision that left B. Mattingly feeling slighted.

   On November 18, 2004, after Tincher's interview for a Leadership Council position, but

before his acceptance of the Business Development Leader position, he made an appointment to

see Charles Adams ("Adams"), a Helena Vice President at Helena's headquarters in Collierville,

Tennessee, and with whom Tincher was acquainted.  Tincher was on his way to Cleveland,

Mississippi, to make a sales call on Sanders Fertilizer.  On the way down to Mississippi, Tincher

called Adams on a cell phone and asked to meet him.  Tincher and Adams met for about an hour;

Tincher informed Adams that he was dissatisfied with his employment at Miles and expressed an

interest in discovering whether Helena had an opportunity for him.  Adams informed him that it

was not an area in which he had authority, but that he would get him in touch with the correct

people.

On December 1, 2004, Adams called Tincher and told him he needed to meet with Doug Goff ("Goff"), Division Manager of the North Central Division, and Randy Parman ("Parman"), Vice President of the Northern Business Unit, but that they were not available until later in December.  The men discussed setting up a meeting for December 16, a date that was later confirmed.  During that phone call, Tincher informed Adams that another Miles employee, whom he did not name, might be interested in attending the meeting as well.  However, Tincher had B. Mattingly in mind because he knew Brian was interested in looking at other opportunities as well.

At some point following this phone call, Tincher informed B. Mattingly of the December 16 meeting with Helena, and B. Mattingly expressed an interest in attending.  B. Mattingly, in turn, informed J. Mattingly of the meeting, who asked if he could attend as well.  B. Mattingly prepared a PowerPoint presentation for the meeting, and he and Tincher reviewed it together before the meeting.

On December 16, 2004, the three men traveled to a hotel in Louisville and met with Adams, Goff, and Parman.  The group ate lunch and then went to a hotel conference room, where B. Mattingly gave the PowerPoint presentation.  The presentation contained some very general  information, but also contained four slides that were versions of maps prepared by Greg Clifton in the fall of 2004 for use at weekly Miles managers' meetings.  The maps were intended to show where Miles' wholesale business was located in terms of chemical, fertilizer, and seed.  The original maps included scales reflecting the quantities of products sold in each county, and the versions on the slides do not include the scales.  However, the meeting's participants agree that these map slides were not a part of the presentation.  The remainder of the PowerPoint

5

presentation contained slides entitled "Wholesale Sales Chemicals," "Private Label Sales," "2003-2004 Private Label Sales Summary," and "Top Ten Reasons for Growth."  Of these, the participants agree that only the latter was shown to the Helena representatives.  The Helena representatives also gave a PowerPoint a presentation about Helena as a company.

At the end of the meeting, Parman told Tincher, B. Mattingly, and J. Mattingly that the three of them would need to prepare projections on possible sales and expenses.  Parman later told Tom Underwood, a business analyst who worked for Parman, that Helena was considering an opportunity to open a branch in Kentucky and asked him to send a form to Tincher that he could use to prepare the projections.  After Tincher received the "pro forma income statement," he, B. Mattingly, and J. Mattingly worked to create the projections.  After receiving the projections, Mr. Underwood compared them with an existing, comparable Helena wholesale location and made some changes.

The parties communicated back and forth sporadically throughout December with a few conference calls and email exchanges.  During that time, Tincher, B. Mattingly, and J. Mattingly continued to fulfill their job responsibilities as Miles employees, including obtaining prepay deposits and bulk tank commitments for Big Rivers and working on dealer rebates.  Dealer prepay deposits were typically obtained by Big Rivers from late November through early January.  The purpose of prepay deposits is for dealers to obtain discounts on products they know they will sell during the next planting season.  With bulk tank commitments, a dealer designates a distributor to act as its agent for all deliveries of bulk products from a particular manufacturer made during the ensuing sales season.  Distributors and dealers make annual agreements for the distributor to pay the dealer an incentive or rebate for purchases made during

6

the previous growing season.  Big Rivers usually paid these rebates to dealers during the weeks

of its annual Dealer Conference, unless the dealer requested an earlier payment.  In 2005, the Big

Rivers Dealer Conference was scheduled for January 13th.

On January 7, 2005, Tincher, B. Mattingly, and J. Mattingly traveled to Helena's

headquarters in Collierville and met with Helena's President, Mike McCarty, Adams, Parman,

and Goff.  Prior to that date, Parman concluded that he was in favor of hiring Tincher, B.

Mattingly, and J. Mattingly and made that recommendation to Mr. McCarty.  The purpose of the

meeting was to give Mr. McCarty a chance to meet the three and evaluate the potential move.

Tincher, B. Mattingly, and J. Mattingly were not offered employment during the January 7

meeting but were told they would be contacted when a decision was made.  Overnight, Parman

received approval from Mr. McCarty to make an offer.

B. Mattingly and J. Mattingly both went into work at Miles' offices on Saturday, January

8.  During the morning, Tincher received a call from Parman who confirmed that Helena wished

to offer all three men employment.  Tincher then contacted the Mattinglys.

The three were not authorized to make offers of employment to potential employees until

they became Helena employees on Monday, January 10, after submitting their resignations.  The

three met Anita Fuqua, Richard Peveler, and Gregory Clifton for lunch that day and informed

them that they would be resigning on Monday and that there might be an employment

opportunity for them with Helena.  However, they did not offer them employment.  The three

then went to the home of Vince Hayden, who had served as Miles' General Manager before his

retirement, and informed him of their plans.

While they were at Vince Hayden's, his son, Matt Hayden, a Miles salesman, came to the

house, and they informed him of their plans as well.  They also informed Matt that there might

be an employment opportunity for him at Helena.  They did not offer him employment at Helena

at that time.

     That afternoon, Parman talked with Tincher, B. Mattingly, and J. Mattingly about

compensation.  Tincher sent Goff a list of Miles employees to whom he thought Helena should

make job offers.  The list included the employees' hire date by Miles and their job responsibility

at Big Rivers.  The list also included wage information for each employee, which Tincher has

stated reflected their projected wages at Helena.

On Sunday, January 9, Tincher cleaned out his office at Miles and called Billy Joe Miles

to schedule a meeting for the following day.  B. Mattingly called three other Big Rivers

salesmen, Tommy Dublin, Abe White, and Jack Hamilton, and asked them to come to a meeting

at the Ramada Inn in Henderson at 10:00 a.m. the following day, but said nothing about the

purpose of the meeting.  The hotel in Henderson was chosen as the meeting location because the

salesmen would be traveling from different parts of the surrounding area; they were not all based

out of Miles' headquarters in Owensboro.

Also on Sunday, Goff sent a draft of a memorandum to the three confirming the offer of

employment to Parman and a member of Helena's Human Resources department for approval.

The memorandum was not sent to Tincher, B. Mattingly, and J. Mattingly until Monday, January

10, when Goff received approval from the H.R. Department.

On January 10, Tincher met Billy Joe Miles for breakfast at about 7:00 a.m. and told him

he was resigning effective immediately.  He then dropped off his resignation letter to Seymour at

the office and went to the Ramada Inn in Henderson, Kentucky for the previously arranged

meeting.

B. Mattingly and J. Mattingly also both tendered their resignations on the morning of January 10.  By the 10:00 a.m. meeting, all three had resigned and had authority to make offers of employment for Helena.  Although Matt Hayden already knew the situation, Tincher, B. Mattingly, and J. Mattingly explained what had occurred to Abe White, Jack Hamilton, Tommy Dublin, and all four were then offered employment at Helena.  While none of the salesman accepted his offer immediately, each accepted later that day.  That night, Goff arrived in Owensboro to assist in setting up the new Helena branch.

On Tuesday, January 11, Helena set up temporary headquarters at the Fairfield Inn in Owensboro.  J. Mattingly spent the day at the Fairfield Inn, discussing employment with Miles truck drivers and warehouse workers.  Tincher toured a potential warehouse site with Goff and arranged for vehicles and cell phones.  B. Mattingly spent the day with Matthew Likens, sales manager for Helena Chemical, visiting potential customers.

On Wednesday, January 12, there was a meeting at the Casino Aztar in Evansville, Indiana.  Helena's Human Resources department made a presentation to the new Helena employees.

On January 17,  Helena signed a lease for a warehouse in Owensboro, but due to zoning and permitting issues, Helena was ultimately not able to utilize the warehouse.  Helena signed the lease for a second warehouse on February 16, 2005, but did not receive an occupancy permit until March 3, 2005.

In their resignation letters, Tincher, B. Mattingly, J. Mattingly, Anita Fuqua, and Matt Hayden all offered to come back and assist in any work left unfinished.  Anita Fuqua was on

9

maternity leave at the time she resigned.  In her position at Miles, she, along with B. Mattingly, was responsible for calculating manufacturer rebates.  The rebate calculations were nearly complete by January 10, 2005, but some information necessary to complete the rebates was not available.  In February and March of 2005, Fuqua returned to assist Big Rivers, at its request,  in completing the rebate calculations.  In March of 2005, B. Mattingly provided information to Ed Delaney, Miles' accounting manager at the time, intended to help Miles obtain commissions from a seed manufacturer.

**STANDARD**

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the

mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

The Complaint makes six claims against the Defendant: (I) conversion, (II) aiding and abetting breach of fiduciary duty; (III) interference with contractual and business relationships; (IV) misappropriation of trade secrets and confidential information; (V) unfair competition, and (VI) punitive damages.  In a footnote to its Memorandum in Reply on its Motion for Partial Summary Judgment and in Response to Helena's Cross-Motion for Summary Judgment, Miles states that in light of discovery in this action, it will no longer pursue its claims for conversion, misappropriation of trade secrets and confidential information, and unfair competition.  The Court believes such a voluntary release is more appropriate for the body of the brief than a footnote, but the Court will accept the release.  The Court therefore finds that Counts I, IV, and V must be **DISMISSED**.  Thus, the Court will only address Counts II, III, and VI in this memorandum opinion.

## A.  Aiding and Abetting Breach of Fiduciary Duty

Both parties have moved for summary judgment as to Count II of the Complaint, in which Miles alleges that Helena aided and abetted the former Employees in the breach of their fiduciary duties owed to Miles.

Under Kentucky law, "'a person who knowingly joins with or aids and abets a fiduciary in an enterprise constituting a breach of the fiduciary relationship becomes jointly and severally

11

liable with the fiduciary for any profits that may accrue.'"  *Serv. Drywall Co. v. Commonwealth Walls, Inc*., 2008 U.S. Dist. LEXIS 34683, at *8 (W.D. Ky. Apr. 26, 2008) (quoting *Steelvest, Inc. v. Scansteel Service Center*, 807 S.W.2d 476, 485 (Ky. 1991)).  In order to prevail on its claim that Helena aided and abetted the former Employees in the breach of fiduciary duties owed to Miles, Miles must prove (1) the existence of a fiduciary relationship between the former Employees and Miles; (2) a breach of that fiduciary relationship; and (3) that Helena knew of the breach and knowingly joined or aided and abetted the actions constituting the breach.  *Steelvest*, 807 S.W.2d. at 485.

**1.   Existence of a Fiduciary Relationship**

As noted above, the Complaint refers to only ten former Employees: Tincher, B. Mattingly, J. Mattingly, Charles White, Matthew Hayden, Tommy Dublin, Jack Hamilton, Richard Peveler, Anita Fuqua, and Gregory Clifton.  The Complaint alleges that these former Employees collectively owed Miles fiduciary duties that were breached.  However, in its subsequent pleadings, Miles has argued only that Tincher, B. Mattingly, and J. Mattingly owed and breached fiduciary duties and has made no attempt to speak to any alleged fiduciary duties owed by the other seven former Employees.  Therefore, the Court must assume that Miles does not and will not argue that any of the former Employees, except for Tincher, B. Mattingly, and J. Mattingly owed fiduciary duties to Miles.

"Under Kentucky law, a fiduciary relationship exists where a relationship is 'founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking.'"  *Serv. Drywall Co.,* 2008 U.S.

12

Dist. LEXIS 34683, at *5 (quoting *ATC Distrib. Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc*., 402 F.3d 700, 715 (6th Cir. 2005) (quoting *Steelvest*, 807 S.W.2d at 485)).  It is presumed that directors and officers of a corporation are fiduciaries of the corporation, and owe a duty of loyalty and faithfulness to the corporation.  *Steelvest*, 807 S.W.2d at 483; *ATC Distrib*., 402 F.3d at 715.  While it is less likely that an employee not serving as a director or officer may owe a fiduciary duty to the corporation, "'[t]here is no *per se* rule in Kentucky that a 'mere' salesperson cannot owe a fiduciary duty to his or her employer.'"  *Serv. Drywall Co.,* 2008 U.S. Dist. LEXIS 34683, at *5 (quoting *ATC Distrib*., 402 F.3d at 715 (citing *Stewart v. Ky. Paving Co.*, 557 S.W.2d 435, 438 (Ky. App. 1977))).

Therefore, when an employee, not a director or officer, is alleged to occupy a fiduciary status, the Court should consider the specific circumstances of his or her employment in determining whether he or she owed a fiduciary duty to the employer.  *See ATC Distrib*., 402 F.3d at 716 (finding that district court should not have granted summary judgment to employee defendants *solely* because it did not need to even consider the employees' "alleged positions of trust and access to confidential information" on the grounds that salespeople cannot owe fiduciary duties to an employer.).  For example, in *Service Drywall*, the court determined that an employee, not a director or officer of the corporation, owed a fiduciary duty under Kentucky law because he had oversight and control over office operations and access to confidential information; he referred to himself as a "manager" and thought of himself as such; he acted as a face for the company in public; and he provided major services for the company such estimates and bids for potential jobs, budgeting and billing, procuring materials, and approving time sheets and payroll.  *Serv. Drywall Co.,* 2008 U.S. Dist. LEXIS 34683, at *6.  Therefore, the Court will

consider the circumstances of Tincher, B. Mattingly, and J. Mattingly's employment at Miles using factors such as those considered in *Service Drywall*.

### a.  Specific circumstances of employment

At the time of his resignation, J. Mattingly had been employed by Miles for close to eighteen years.  His title at the time was Manager of Chemical Operations.  He reported to Tincher when Tincher was the General Manager.  The job description for his position states that he was responsible for planning and managing inventory and customer orders, meeting transportation goals to achieve the lowest cost deliveries, and coordinating the transportation of chemicals, equipment, and bagged fertilizer.  He had relatively recently been given access to the periodic profit and loss statements for Big Rivers.  At most, he would have about twenty-five people reporting to him, including truck drivers.  He was responsible for acquiring the delivery vehicles that Miles owned as well as renting delivery trucks in season.  He had a company truck, a company credit card, a company cell phone, and a fuel card for use on the pump owned by Miles.

At the time of his resignation, B. Mattingly had been employed by Miles for about fourteen years.  His title at the time was Sales and Marketing Manager, and he was in charge of sales and marketing for both retail and wholesale.  He had approximately thirty people reporting directly to him while he reported directly to Tincher, when Tincher was the General Manager. He was also responsible for making recommendations as to hiring and firing sales and marketing employees.  He had access to the sales information and the periodic profit and loss statements for the seed, Big Rivers, Opti-Crop, retail, and the Research & Development divisions of Miles.  He spent time identifying potential new customers with the assistance of territory salespeople.  He

14

had a company vehicle, cell phone, laptop computer, Palm Pilot, and fuel card.

At the time of his resignation, Tincher had been employed by Miles for about fourteen years. In the late 1990s, he became General Manager of Miles Farm Supply, and as GM, oversaw the activities between the different divisions of the company. As such, he reported directly to Seymour. He had access to periodic profit and loss statements and sales reports. He had a company vehicle, fuel card, and cell phone. The reorganization of Miles into the Leadership Council structure in October 2004 eliminated the General Manager position, and Tincher was not selected for a position on the Council. Thus, during the period of time that is the subject of this action, Mr. Tincher's role within the company was in flux. On November 30, 2004, he accepted the new position of Business Development Leader. While he did not spend a substantial period of time in that position, his job description was:

> Research existing ideas, promote new ideas to the Leadership Council and support the ITS to initiate new business opportunities and/or alliances that are profitable for both our customers, partners and ourselves to move us toward our vision.

Miles is a family-owned company. It's only owners are William Miles, Virginia Miles, and Billy Joe Miles. While Billy Joe Miles appears to still be active in the company, only his daughter, Debra Miles Seymour, holds an office within the company, as President. Tincher, B. Mattingly, and J. Mattingly were not officers and directors of Miles, and none were members of the Leadership Council, which began managing Miles before Tincher initiated contact with Helena by meeting with Charles Adams on November 18 in Collierville.

### b. Culture at Miles prior to the resignations

The record reflects that in the months before the former Employees' January 10, 2005, resignations, many of them felt uncomfortable with the new structure of the company or were

beginning to feel unhappy or insecure in the jobs.  Tincher, B. Mattingly, and J. Mattingly have all stated that as the Council formed, they became uncomfortable with the format and composition.  Both Tincher and B. Mattingly took issue with the automatic appointment of Purk, who had only worked at Miles for about ten months, and Head, who had never worked for an agricultural business, to the Leadership Council.

The other Employees who chose to leave indicated that they questioned the appointments made to the Leadership Council, wondered why Tincher and B. Mattingly were not a part of the Council, and were concerned about the company's future.  (Fuqua Depo. 11-16; Hayden Depo. 23-25; Clifton Depo. 12-26; Hamilton Depo. 36-40; White Depo. 26-28).  Some of the Employees took issue with an email from Head, dated November 30, 2004 (Depo. Exh. 17) that seemed to promote his religion.  They have indicated that they felt that if they did not join the email list he was promoting, they would be marked as different.  (Peveler Depo. 23-24; Hayden Depo. 27; Clifton Depo. 20-21).

It appears from the depositions and emails in the record that neither Tincher nor B. Mattingly had a good working relationship with Seymour, Purk, and Head during the latter part of 2004. For example, in an email to B. Mattingly dated October 28, 2004, Head stated:

> I have been trained directly and indirectly to sniff out those individuals who operate in the micromanagement arena and hold them accountable to maturity beyond their level of emotional security.  I am certainly open to correction assuming I have pushed unnecessarily and/or incorrectly.  We will only become Great when we spread out the power to the Leadership Council and allow individuals at all levels to create value without the blockings of a dinosaur-(insecure adolescence operating in a vacuum of power).
> ...
>
> Please understand that my role is to flush out anyone in the organization that is blocking the vision; either knowingly or not...

16

(Depo. Exh. 1).  The Court will not presume to speak to Head's actual intention with this email, but B. Mattingly thought it was a threat to him and other Miles employees.  (Mattingly Decl. ¶ 16).  When B. Mattingly shared this email with Billy Joe Miles, Miles was upset by its contents.  (Billy Joe Miles Depo. 250).  Billy Joe Miles spoke with Head and told him that the email, as it read, was threatening and a problem.  (Billy Joe Miles Depo. 250-251).

Seymour was concerned that Tincher would not be able to fit into the new structure.  (Seymour Depo. Vol III 214).  She, Purk, and Head decided not to give him a Leadership Council position because they did not feel that they would be able to work together given the vision the three of them had for the company.  (Seymour Depo. Vol. III 218).

In late November 2004, B. Mattingly met with Seymour and Billy Joe Miles to discuss dividing the vacant Sales and Marketing position on the Leadership Council into two positions, with Tincher in charge of sales and B. Mattingly in charge of marketing.  In the meeting, Seymour produced an email between B. Mattingly and Tincher in which Tincher had suggested that B. Mattingly should only send the proposal to Seymour because "it might make her think she came up with the idea."  Seymour told them that Head had asked Greg Woodall, who was responsible for Miles' computer systems, to review Tincher's emails.  Seymour stated to her father that the proposed division of the roles wouldn't work because she couldn't work with Tincher.

In a November 30, 2004, meeting between Tincher, Seymour, and Billy Joe Miles, Tincher asked Seymour if she wanted him to remain with the company.  Seymour answered along the lines of "It's best for me if you were not, Benny.  But for the good of the company, I need you."  (Seymour Depo. Vol. III 242-243; Tincher Depo. Vol. I 134; Billy Joe Miles Depo.

17

24).

Emails in the record exchanged between Seymour, Head, and Purk indicate a deteriorating working relationship with B. Mattingly.  On December 14, B. Mattingly sent an email to Seymour and Purk asking for clarification on a prepay situation.  Purk forwarded the email to Head, stating, "Don't you just feel the love in Brian's happy little world!!!"  Head responded, "Too much love for me to accept at one time.  He cannot accept the FACT that he is not GOD and that he is ACCOUNTABLE for his actions."  (Depo. Exh. 5).  Purk responded to B. Mattingly's questions, but B. Mattingly indicated that he would like a face to face conversation about his questions.  In response, Purk told B. Mattingly that his "constant whining about over committing to suppliers is getting old!"  (Depo. Exh. 67).

On January 3, 2005, B. Mattingly received an email from Ronan Cummins, Miles' Opti-Crop Retail Manager, indicating that he was having software problems with a service Big Rivers was using to promote the Opti-Crop services.  B. Mattingly forwarded the email to several people, including Seymour, Purk, and Head, informing them of the situation and indicating that it was a big problem because they were "going into season with program that has no support and no update capability at this time."  In response, Head composed an email to Seymour stating, "Debra, this is yet another reaction that I have to Brian Mattingly's recent barrage of fear driven emails.  As one responsible for the culture, I am appalled at best at the infantile behavior."  (Depo Exh. 54).

Also on January 3, B. Mattingly composed an email entitled "1st of the year report-Q&A for Counsel (sic)."  In addition to reporting on the status of different aspects of the business, he asked the Leadership Council if they had any ideas about direction for 2005 because he hadn't

18

heard anything from them for a while.  (Depo. Exh. 61).  In response, Head sent an email to

Seymour asking "Debra, do you want to deal with Brian or should I bring him in for a

discussion?"  In response to a statement in B. Mattingly's email that "evenings and weekends

make for good opportunities" to work on the incentives projections, he writes "No offense

partner but, you need a life."

Head went on to quote a few of B. Mattingly's statements in the email and posed a

'question' to him:

> Brian, are these statements based on facts or your own insecurities? You must realize that
> we have had an abundance of Positive reactions and support from the "troops" regarding
> recent changes. You seem to be the only person that I hear negative comments from. It
> almost seems that you are whining and want someone to react so you can derive security
> or prove your own doubts.

Head also questioned B. Mattingly's motives for his email: "I don't want to make the wrong

assumption (is Brian genuinely concerned with supporting his President or is he just covering his

butt and hoping for failure?).  (Depo Exh. 68).

Shortly thereafter, on either January 3 or 4, 2005, B. Mattingly met Head and Seymour

for lunch.  Head produced some of the above emails and told B. Mattingly that he did not have a

positive attitude, did not understand Miles' vision, and was not a part of their "organism."

Seymour indicated her agreement. (Brian Mattingly Decl. ¶¶19-20).

### c.  Did Benny Tincher, B. Mattingly, an J. Mattingly owe Miles fiduciary duties?

In Kentucky, "a fiduciary relationship exists where a relationship is 'founded on trust or

confidence reposed by one person in the integrity and fidelity of another and which also

necessarily involves an undertaking in which a duty is created in one person to act primarily for

another's benefit in matters connected with such undertaking." *Serv. Drywall Co.,* 2008 U.S.

19

Dist. LEXIS 34683, at *5 (quoting *ATC Distrib.*, 402 F.3d at 715 (quoting *Steelvest*, 807 S.W.2d at 485)).   Miles quotes this Court in an opinion regarding a request for a preliminary injunction, *INVESCO Institutional (N.A.), Inc. v. Johnson*, 500 F. Supp. 2d 701, 709 (W.D. Ky. 2007), where the Court described the defendants as being "given substantial oversight and control over INVESCO's business operations as well as access to INVESCO's confidential information." Under the circumstances in that case, the Court determined that it was likely that the defendants owed INVESCO common law fiduciary duties under Kentucky law.  *Id.*  Miles has turned that sentence into the standard for a fiduciary relationship in Kentucky, arguing that Tincher, B. Mattingly, and J. Mattingly all were given "substantial oversight and control" over Miles' business and access to confidential information, making them fiduciaries.   However, the Court believes that the proper standard for a fiduciary relationship in Kentucky is the definition set forth in *Steelvest*, quoted above by the *Service Drywall* court.

All three men had been employed by Miles for a significant period of time.  Each oversaw a number of employees, and each had some level of access to profit and loss statements. Like the defendant in *Service Drywall*, each of the three men exercised, on varying levels, some oversight and control over various operations and provided services such as hiring and firing, soliciting customers, budgeting and billing, and procuring various materials.  *Serv. Drywall Co.,* 2008 U.S. Dist. LEXIS 34683, at *6.  The Court believes that it is more likely that of the three, Tincher and B. Mattingly should be considered fiduciaries, although both were experiencing some instability in their employment during the time period that is the subject of this action.

As of Tincher's November 18, 2005, meeting with Mr. Adams in Collierville, he was no longer Miles' General Manager.  As General Manager, he likely had a duty to act primarily for

Miles' benefit.   As the highest ranking non-Miles family employee of the organization, he would have owed fiduciary duties to the company.  However, the events recounted above indicate that as of November 18, 2005, Seymour no longer reposed the same trust and confidence in Tincher as had once characterized his relationship with Miles.  This lack of trust and confidence appears to have been reciprocal.

As set forth above, B. Mattingly's relationship with the Leadership Council was deteriorating in December 2005 and January 2005.  The level of trust or confidence "reposed by one person in the integrity or fidelity of another" required by the fiduciary duty standard in Kentucky may have been lacking.  *Serv. Drywall Co.,* 2008 U.S. Dist. LEXIS 34683, at *5.  However, he still held the Sales and Marketing Manager, a position that gave him a considerable amount of responsibility and access to confidential information.  He solicited new customers and therefore acted as a face of the company.

Miles claims that it had a fiduciary relationship with J. Mattingly because he was a member of upper-management.   However, beyond stating that J. Mattingly referred to himself as a "manager" in the PowerPoint presentation to Helena on December 16, citing his testimony about his duties and responsibilities (without describing them), and highlighting the fact that J. Mattingly admitted he gained access to some profit and loss statements in the last eleventh months of his employment, Miles has failed to show that J. Mattingly's relationship with the company rose to the level "a relationship is 'founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking."  *Serv. Drywall Co.,* 2008 U.S. Dist. LEXIS 34683, at *5.

However, even if Tincher, B. Mattingly, and J. Mattingly could all be considered fiduciaries, Miles has adduced no evidence that any of them acted in a way that would constitute a breach of any fiduciary duty they might have had to Miles.

### 2.  Breach of the Fiduciary Relationship

Even assuming that one or all three of the men may have been in a fiduciary relationship with Miles, the Court finds that Miles cannot prove that such a relationship was breached.  "A breach of fiduciary duty claim has three elements: (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe such duty; and (3) an injury proximately resulting therefrom."  *Westlake Vinyls, Inc. v. Goodrich Corp*., 518 F. Supp. 2d 902, 916 (W.D. Ky. 2007) (citing *Strock v. Pressnell*, 527 N.E.2d 1235, 1244 (Ohio 1988)).

There is simply no evidence that Tincher, B. Mattingly, and J. Mattingly breached any fiduciary duty owed to Miles.  Miles has voluntarily dropped is conversion, misappropriation of trade secrets, and unfair competition claims, indicating a distinct lack of evidence in the record to support any of its claims, including breach of fiduciary duty.  As Seymour repeated many times in her deposition, Miles' allegations are based entirely on "belief."  After two and a half years of litigation and the development of a very extensive record, a "belief" that a fiduciary duty was breached does not constitute evidence and cannot survive a motion for summary judgment.

Tincher did not make contact with anyone at Helena until after his position as General Manager had been eliminated and the Leadership Council began managing the company.  He, alone, had a very informal meeting with Adams on November 18, 2004, at Helena's headquarters.  Little information was exchanged at that meeting and no promises were made by

22

either party, as Adams had no authority to make decisions about new hires or branches.  There was no further contact between any of the former Employees and Helena until the meeting in Louisville on December 16.  By all accounts, during that month-long period, Tincher, B. Mattingly, and J. Mattingly continued to perform all of their duties at Miles.

No promises were made at the December 16 meeting.  Tincher, B. Mattingly, and J. Mattingly were asked prepare projections on possible sales and expenses if Helena were to open a branch in Kentucky.  The only work the men did in December related to Helena was preparing the"pro forma income statement."  There is no dispute that Tincher, B. Mattingly, and J. Mattingly continued to fulfill their job responsibilities as Miles employees, including obtaining prepay deposits and bulk tank commitments for Big Rivers and working on dealer rebates.

The next major contact with Helena occurred on January 7, 2005, when Tincher, B. Mattingly, and J. Mattingly traveled to Helena's headquarters in Collierville and met with Helena's President, Mike McCarty, Adams, Parman, and Goff.  Tincher, B. Mattingly, and J. Mattingly were not offered employment during the January 7 meeting but were told they would be contacted when a decision was made.  Overnight, Parman received approval from Mr. McCarty to make an offer.  The next morning, despite meeting with Helena's President the day before, B. Mattingly and J. Mattingly went into work at Miles, as the usually did on Saturday mornings.

After being offered employment at Helena,  Tincher, B. Mattingly, and J. Mattingly did tell the former Employees what was happening and that they might have employment opportunities at Helena, but they did not offer employment to any of them until after they tendered their resignations at Miles and became Helena employees.  All of the Miles customers

who later switched to Helena have stated that they were not contacted in advance about the move and were not induced to become Helena customers.

Miles and Big Rivers had a very profitable year in 2004. Miles' profits in 2004 were approximately $8 million, more than double what had ever been achieved before. (Delaney Depo. 60-62). Seymour has admitted that Tincher, B. Mattingly, J. Mattingly, and the other former Employees contributed to that success. (Seymour Depo. Vol II 143). Such success, due in part to Tincher, B. Mattingly, J. Mattingly, hardly indicates that the three were engaged in an ongoing breach of any duty owed to Miles.

When asked what factual basis she had for concluding that any of the former Employees took with them originals or copies of customer lists or files, email lists, pricing sheets, product information, lease agreements, and other confidential information, Seymour stated she assumed and believed such documents had been taken, but that she had no factual basis for her claim. (Seymour Depo. Vol. II 174). Seymour also admitted that the former Employees would all have general knowledge about the agricultural wholesale business, gained over the course of their employment with Miles or any other competitors by whom they were employed before working for Miles. (Seymour Depo. Vol. I 178-180).

All parties agree that there are no long term supply contracts between wholesale agricultural chemical distributors and their customers. Dealers are free to purchase product from different wholesalers on an order-by-order basis. When a salesperson moves from one wholesale distributor to another, he or she often brings customers to the new distributor. It is common for customers to follow the salesperson, and in the past Big Rivers has received new customers as a direct result of hiring a new salesperson. (Billy Joe Miles Depo. 67). Billy Joe Miles admitted

24

that there was nothing wrong with White, Hayden, Hamilton, and Dublin taking some Big Rivers customers with them to Helena.  (Billy Joe Miles Depo. 71).  For example, Abe White took the business of Wabash Valley, Hamson Ag and J A Ag from Terra and brought it to Big Rivers. (White Decl. ¶ 5).  Jack Hamilton opened up a new territory for Big Rivers, and brought in a number of new customers including Butlers, Growers Co-op, Schopmeyer Farm Stores, Logan Ag and Cloverdale Ag. (Hamilton Decl. ¶ 5) .

Tincher, B. Mattingly, and J. Mattingly did not sign contracts with noncompetition provisions, nor did any Miles employees.  (Seymour Depo. Vol I 116).  Mrs. Seymour has admitted that there was nothing inherently wrong with any of them going to work for a competitor.  (Seymour Depo. Vol I 118).

Assuming, *arguendo*, that Tincher, B. Mattingly, and J. Mattingly owed fiduciary duties to Miles, there is no evidence that Tincher, B. Mattingly, and J. Mattingly breached any fiduciary duty.  There is no reason why these men could not have met with each other, "to plan for the opening of a rival company for which they would rather work."  *ATC Distrib*., 402 F.3d at 716.  There is no evidence that while planning a possible move to Helena they failed to perform all of the duties required of them by Miles.  Miles has introduced no evidence that the three took any confidential information with them or improperly induced other employees to make the move as well.

### 3. Knowingly Aiding and Abetting the Breach

In order to prevail on its claim that Helena aided and abetted the former Employees in the breach of fiduciary duties owed to Miles, Miles must prove (1) the existence of a fiduciary relationship between the former Employees and Miles; (2) a breach of that fiduciary relationship;

and (3) that Helena knew of the breach and knowingly joined or aided and abetted the actions constituting the breach.  *Steelvest*, 807 S.W.2d. at 485.

As noted above, the Court finds that there is no evidence that Tincher, B. Mattingly, and J. Mattingly breached any fiduciary duties owed to Miles.  Therefore, Helena cannot be liable to Miles for aiding and abetting the breach of a duty that was never breached.  Helena is **GRANTED** summary judgment as to Count II of the Complaint.

### 3. Tortious Interference with Contractual and Business Relationships

Count III of Miles' Complaint alleges that Helena tortiously interfered with its existing and prospective business relationships.

### A. Interference With Prospective Business Relationships

A claim of tortious interference with prospective business relationships requires the plaintiff to prove: (1) the existence of a valid business relationship or its expectancy; (2) the defendant's knowledge of the relationship, (3) an intentional act of interference; (4) an improper motive for the interference; (5) causation; and (6) damages to the plaintiff.  *CMI, Inc. v. Intoximeters, Inc*., 918 F. Supp. 1068, 1080 (W.D. Ky. 1995) (citing *National Coll. Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 857-58 (Ky. 1988) (adopting Restatement (Second) of Torts as reflective of Kentucky law)).  To demonstrate an improper motive, the plaintiff must show malice or "some significantly wrongful conduct."  *Hornung*, 754 S.W.2d at 859; see also *Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC*, 182 S.W.3d 529, 534 (Ky. Ct. App. 2005)

Miles has produced no evidence that Helena intentionally and improperly caused a third party not to enter into a contractual relationship with Miles.  Miles' only argument in response to Helena's charge that it did not interfere with any prospective business relationships is that

26

Helena is liable for aiding and abetting breaches of fiduciary duty.  As the Court has already determined that Helena is not liable for aiding and abetting breaches of fiduciary duty, because there is no evidence of any such breach, this argument is without merit.

By all accounts, there are no long-term contracts in the agricultural supply industry. While Miles might have assumed that its wholesale customers would continue to be its wholesale customers, it had no guarantee that the customers would not chose to go with another distributor the next year, whether Helena was in the picture or not.  Seymour admitted that whenever one commitment to a distributor ends, the customer is free to go to a competitor, and there are absolutely no repercussions to such a switch.  (Seymour Depo. Vol. I 97-98).  Seymour stated that there are customers who leave Big Rivers on their bulk tank commitment accounts, and there are customers that Big Rivers takes from its competitors.  (Seymour Depo. Vol. I 99-100).

In addition, Helena has produced the affidavits of eight former Miles and Big Rivers customers.   Each customer states that he chose to discontinue business with Miles and begin business with Helena for various lawful and proper reasons.  (Neibel Aff. ¶¶ 7-9; Swinney Aff. ¶ 10; Finney Dec. ¶¶ 7-8; Englert Dec. ¶ 8; Logan Dec. ¶ 6; Weber Dec. ¶ 9; Hamson Dec. ¶ 11; Nelson Dec. ¶¶ 7,9).  For example, James Swinney, General Manager of Posey County Co-op, stated that the co-op has actually continued to do some business with Big Rivers, but has moved more of its business to Helena because of the superior service provided by Helena and salesman Matthew Hayden (Swinney Aff. ¶ 10).  Sam Englert, who was the Manager of Graves County Co-op during the time in question, stated that after the co-op fulfilled its prepay commitments with Big Rivers, it chose to move its business to Helena in order to maintain its relationship with

27

salesman Tommy Dublin.  (Englert Dec. ¶ 8).  Ed Logan, Vice President of Logan Agri-Service, stated that Logan moved its business to Helena due to its good relationship with salesman Jack Hamilton, because no one from Big Rivers called on Logan in 2005, and because of better pricing and a more favorable rebate program.  (Logan Dec. ¶ ¶ 6-7).

Each customer also stated that he had no prior knowledge that Tincher, B. Mattingly, and J. Mattingly were thinking about resigning from Miles to work for Helena.  (Neibel Aff. ¶ 5; Swinney  Aff. ¶ 8; Finney Dec. ¶ 4; Englert Dec. ¶ 4; Logan Dec. ¶ 4; Weber Dec. ¶ 8; Hamson Dec. ¶ 3; Nelson Dec. ¶ 8).  In fact, several of these customers worked with the Miles Employees just prior to their resignations, making prepay deposits with Miles for the purchase of products in 2005.  (Neibel Aff. ¶ 5; Finney Dec. ¶ 4; Englert Dec. ¶ 7; Hamson Dec. ¶6 ).

Given the nature of the industry at hand, Miles had not proved that it had a "valid business relationship or its expectancy" with the customers who chose to go to Helena.  *CMI, Inc.*, 918 F. Supp. at 1080.  In addition, Miles had not even attempted to introduce evidence of an "improper motive" on Helena's part.  *Id.*  There is no evidence of  malice or "some significantly wrongful conduct."  *Hornung*, 754 S.W.2d at 859.

**B.  Tortious Interference With Existing Business Relationships**

A claim of tortious interference with an existing contractual relationship requires the plaintiff to prove: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) intent to cause the contract's breach; (4) the defendant's conduct caused the breach; (5) damages; and (6) lack privilege or justification to excuse its conduct.  *CMI*, 918 F.Supp. at 1079.

In *Steelvest*, the Kentucky Supreme Court stated that, like the tort of interference with a

28

prospective business relationship, "under Kentucky law, tort liability exists for the interference with a known contractual relationship, if the interference is malicious or without justification, or is accomplished by some unlawful means such as fraud, deceit, or coercion." *Steelvest*, 807 S.W.2d at 487.

The only existing contractual relationship Miles has identified as having been tortiously interfered with by Helena is its "bulk tank" order with Wabash Valley Service Co.  On December 30, 2005, B. Mattingly and Tincher met with Todd Neibel, the General Manager of Wabash Valley, and secured a commitment from Wabash Valley for the purchase of bulk product from Monsanto through Big Rivers.  (Tincher Depo. Vol. II 47; Neibel Aff. ¶ 5).  A bulk tank commitment is an arrangement wherein a dealer designates a distributor to act as its agent for bulk products for a particular manufacturer.  The customer agrees that all product placed in its tanks for that year will be credited to a particular wholesaler's account.  (Seymour Depo. Vol. I 96-100).  At the end of the one-year commitment, the customer is free to contract with another wholesaler without repercussions.  (Id. at 98-99).

Todd Neibel has produced an affidavit specifically stating that "Helena had nothing to do with Wabash Valley's decision to stop doing business with Miles and Big Rivers."  (Neibel Aff. ¶ 9).  In fact, in February of 2005, Mr. Neibel met with Mrs. Seymour and Billy Joe Miles and informed them that Wabash Valley intended to continue doing business with Big Rivers.  (Id. ¶ 7).  However, when Miles hired a Wabash Valley employee, who had signed a non-competition agreement, without prior notice, Wabash Valley considered it a "serious breach of trust" by a principal supplier and determined that it could no longer continue to do business with Miles and Big Rivers.  (Id. ¶ ¶ 7-8).  Thus, there is no evidence that Wabash Valley's decision to cease

29

business with Miles was a result of any action on Helena's part, and in fact may have been caused by Miles' own actions.

Further, Miles has not produced any evidence that it suffered damages as a result of the loss of the Wabash Valley bulk tank order. Mrs. Seymour admitted in her deposition that Miles was not damaged by the release of Wabash Valley's bulk tank commitment for 2005 because Monsato agreed to pay Miles the amount that it would have earned had the commitment not been released. (Seymour Depo. Vol I. 102). As the parties had no long-term commitment and the industry operates on an order-by-order basis, Miles had no stake in a future order from Wabash Valley.

In addition, there is no evidence in the record of either the malice or unjustified conduct on Helena's part required to prove intentional interference with an existing business relationship. *Steelvest*, 807 S.W.2d at 487. Miles has failed to identify any other existing contractual relationships with which Helena allegedly tortiously interfered.

For all of these reasons, Helena is **GRANTED** summary judgment as to Count III of the Complaint.

### 6. Punitive Damages

Count VI of Miles' Complaint alleges that Miles is entitled to an award of punitive damages because Helena's actions were undertaken with fraud, oppression or malice. Counts I, IV, and V have been dismissed from this action, and Helena is entitled to summary judgment on the Counts II and III. Therefore, Miles is left with no claim for damages.

### CONCLUSION

The Court has reviewed the extensive record produced in this action. Miles has not

produced any evidence that the former Employees breached a fiduciary duty, that Helena aided and abetted in a breach of fiduciary duty, or that Helena interfered in existing or prospective business relationships.  On the contrary, at every turn, Miles representatives have stated that this action is based upon their "belief" that such things must have happened.  A "belief" will not support or survive a motion for summary judgment.  For all of the reasons above, the Plaintiff's Motion for Partial Summary Judgment is **DENIED**, and the Defendant's Motion for Summary Judgment is **GRANTED**.